**United States District Court**
**District of Massachusetts**

_____
                              )
Marina Gudava,                )
                              )
          Plaintiff,          )
                              )
     v.                       )
                              )     Civil Action No.
Northeast Hospital Corporation, )   17-12414-NMG
d/b/a Beverly Hospital,       )
                              )
          Defendant.          )
_____)


**MEMORANDUM & ORDER**

**GORTON, J.**

     This case arises out of an employment dispute between

Marina Gudava ("Gudava" or "plaintiff") and her former employer,

Northeast Hospital Corporation ("NHC" or "defendant").  Gudava

alleges that NHC discriminated against her by failing to

accommodate her disability, retaliating against her and

ultimately terminating her employment.  The Complaint states

five claims: 1) disability discrimination in violation of Mass.

Gen. Laws c. 151B ("Chapter 151B") (Count I); 2) retaliation in

violation of the same statute (Count II); 3) wrongful

termination in violation of public policy (Count III); 4)

interference with her rights under the Family and Medical Leave

Act ("FMLA") (Count IV); and 5) retaliation in violation of the

FMLA (Count V).

Pending before the Court is the motion of defendant for summary judgment and to strike certain documents and statements from plaintiff's opposition to summary judgment.

## I.   **Background**

### A.   **The Parties**

In September, 2008, Gudava began working as a Staff Pharmacist in the Pharmacy Department of Beverly Hospital ("Beverly"), which is owned and operated by NHC.  Beverly is a full-service hospital and requires the presence of a Staff Pharmacist to dispense medications at all times.  NHC also owns and operates Addison Gilbert Hospital ("AGH") in Gloucester, Massachusetts, which also requires the presence of a Staff Pharmacist.

### B.   **Scheduling at NHC Facilities**

Staff Pharmacist schedules were prepared in advance by an assigned Staff Pharmacist in four-week intervals and were approved by the Pharmacy Operations Manager, Wendy Cahill ("Cahill").  Staff Pharmacists were generally assigned to four different kinds of shifts, including daytime (6:00 A.M. / 8:00 A.M. to 2:30 P.M. / 4:00 P.M.), swing (9:00 A.M. / 11:00 A.M. to 5:30 P.M. / 8:30 P.M.), evening (2:30 P.M. / 3:00 P.M. to 11:00 P.M. / 11:30 P.M.) and overnight (9:00 P.M. / 11:00 P.M. to 7:00 A.M.).

It was generally expected that all Staff Pharmacists would be available to work any combination of the available shifts at Beverly but NHC did hire some Staff Pharmacists to work exclusively evening and overnight shifts. Assigned shifts at AGH involved the review and approval of chemotherapy drugs. For that reason, only Staff Pharmacists with specialized chemotherapy training, such as Gudava, could be assigned shifts at AGH.

### C.    Gudava's Health Concerns and Medical Leave

In December, 2011, Gudava applied for intermittent leave under the FMLA due to diagnosed migraine attacks. NHC granted Gudava's request and allowed her intermittent leave between November, 2011, and November, 2012.

NHC approved at least seven subsequent requests for intermittent FMLA leave due to Gudava's medical problems. Gudava explains that, at some point during that period, another Staff Pharmacist made a negative comment about her use of FMLA leave but Gudava did not report that incident to NHC.

In May, 2012, Gudava submitted to NHC a letter from her doctor, Dr. Litvak, recommending that Gudava refrain from working overnight shifts for a period of six months while she underwent treatment for her migraine headaches. In accordance

with Dr. Litvak's recommendation, NHC did not schedule Gudava to work an overnight shift for six months.

In December, 2012, NHC requested that Gudava provide additional information to support her request for continued accommodation. Upon receiving a certification for medical leave signed by Dr. Litvak, NHC renewed Gudava's accommodation. She did not work another overnight shift for the duration of her employment with NHC after her second request was approved.

### D. Harassment at NHC Facilities

In December, 2016, Gudava met with NHC Human Resources ("HR") personnel and Cahill, regarding allegations that she was being terrorized, abused, bullied, harassed and discriminated against at work. Gudava cited incidents of alleged abuse, including: 1) two occasions on which Cahill gave Gudava a "look" or "made a face" behind her back; 2) a period where Gudava was assigned to work at AGH three days in a row without being asked and without receiving a "thank you"; 3) an incident of Cahill yelling at Gudava; 4) required participation in an "unproductive" meeting about Gudava's request for time off; and 5) her prohibition from serving on the Staff Pharmacists Committee.

At her deposition, Gudava testified that Cahill also physically accosted her and harassed her because Cahill viewed Gudava as a "bad seed".

NHC requested that Gudava provide a written recitation of the alleged incidents. In response, Gudava's counsel sent a letter to NHC's Director of Employment and Employee Relations outlining various instances of alleged workplace misconduct. NHC attempted to schedule a meeting with Gudava but she declined, insisting that all communications should be through her attorney.

**E.    Gudava's Accommodation Request**

In January, 2017, Gudava presented NHC with a letter from Dr. Litvak recommending that she work only daytime hours because afternoon and evening hours aggravated her migraine headaches. NHC requested additional information to be provided by Dr. Litvak, including answers to a list of questions and several forms requesting an evaluation of Gudava in light of her assignment as a Staff Pharmacist.

The following month, Gudava emailed NHC claiming that her accommodation request was being unreasonably delayed. She met with HR personnel the next day who explained that Gudava's 2013 health records were insufficient to support her renewed request.

In March, 2017, NHC received the requested information from Dr. Litvak, who opined that working daytime shifts (ending before 6-7 P.M.) would help reduce Gudava's frequent migraines.

NHC denied Gudava's requested accommodation because, according to NHC, it would have imposed an undue hardship on its Staff Pharmacists in Beverly and at AGH. NHC maintained that if Gudava worked only shifts ending before 6 or 7 P.M., other Staff Pharmacists would be forced to absorb additional swing and evening shifts, which would present significant retention and recruitment issues for Staff Pharmacist positions at Beverly.

NHC instead offered Gudava a per-diem position, whereby she would be scheduled based on the needs of Beverly, after full and part-time staff schedules are finalized, and would not be required to work swing, evening or overnight shifts.

Gudava immediately rejected NHC's offer. In response, NHC recommended that Gudava take a few days to reconsider. On April 14, 2017, Gudava sent NHC an email stating that she considered the offer of per-diem employment "unacceptable, an insult and a threat to [her] current employment." NHC notified Gudava in May, 2017, that, because she had rejected NHC's offer, she would be expected to work her regularly scheduled shifts.

**F.   Gudava's Alleged Performance Issues**

Throughout 2017, NHC maintained a Therapeutic Interchange Program ("TI Program") that directed Staff Pharmacists to follow a certain protocol in substituting prescribed medications.

Clinical Coordinator Jennifer Mackey-LaBrecque ("Mackey-LaBrecque") conducted an audit of Staff Pharmacist compliance with the TI Program beginning in May, 2017, and identified Gudava as noncompliant.  Gudava disputes that fact and insists that she used her discretion to deviate from the TI Program only when she determined, in her professional judgment, that doing so was in the interest of the patient.

In June, 2017, Mackey-LaBrecque and Cahill met with Gudava to discuss Gudava's alleged noncompliance.  The night after that meeting, Gudava visited the emergency room and received a recommendation from her neurologist that she remain out of work for one week.  Gudava submitted a request for continuous leave under the FMLA the following day which NHC granted.

NHC also implemented a counseling program in 2017 that involved Staff Pharmacists counseling patients on their medications prior to the patient's discharge ("the Patient Counseling Program").  In September, 2017, Mackey-LaBrecque conducted an audit of the Patient Counseling Program and

determined that for the previous 14 shifts, Gudava had not complied with the Patient Counseling Program requirements.

### G.   NHC's Investigation of Harassment

In June, 2017, upon her return to work after a week of FMLA leave, Gudava received a "Level III Final Written Warning" ("the First Warning") for "insubordination and noncompliance".  Gudava appealed through the internal NHC mechanism but the First Warning was ultimately upheld.

The investigation conducted by NHC to assess Gudava's appeal resulted in allegations by Gudava of retaliation and discrimination against her by Cahill.  NHC sent Gudava a letter requesting a meeting to discuss her allegations of workplace misconduct to which Gudava did not respond.

In July, 2017, NHC began a formal investigation into Gudava's concerns about retaliation and harassment.

On July 6, 2017, Gudava left work early because she was experiencing high blood pressure.  She was seen by Employee Health, who recommended that she be excused for the day.  Gudava did not, however, speak with Cahill prior to leaving work as required by NHC's "Work Rules" policy.

HR personnel contacted Gudava the following day to schedule a time to discuss the allegations but Gudava did not feel well enough to discuss her allegations at that time.  An inquiry on

July 12, 2017, yielded the same response.  Later that day, NHC
sent Gudava a letter requesting that she contact HR as soon as
possible to discuss her allegations.

Two days later, Gudava's attorney emailed NHC and insisted
that Gudava would not meet with NHC personnel outside of her
attorney's presence.  NHC responded to Gudava in writing that HR
would not engage with outside counsel during routine
investigations and that, as a result, the investigation would be
finalized without Gudava's input.

In August, 2017, HR personnel and Cahill met with Gudava to
discuss the results of the investigation.  At that meeting,
Gudava was informed that NHC had uncovered no facts in support
of her allegations of retaliation and discrimination.  Gudava
was also issued a "Level III Final Written Warning" ("the Second
Warning") for leaving work early without approval on July 6,
2017.

NHC terminated Gudava's employment in September, 2017,
effective October 3, 2017.

### H.  Procedural History

In July, 2017, Gudava, represented by counsel, filed a
Charge of Discrimination with the Massachusetts Commission
Against Discrimination ("MCAD").  That same day, she requested
permission to withdraw her charge and file a private right of

action in civil court.  MCAD granted her request in August, 2017, and Gudava filed a complaint against NHC in Massachusetts Superior Court in December, 2017.  Defendant promptly removed the case to this Court.

## II.   **Defendant's Motion for Summary Judgment**

### A.   **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co._, 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc._, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that

there is a genuine, triable issue. _Celotex Corp._ v. _Catrett_, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. _O'Connor_ v. _Steeves_, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. _Celotex Corp._, 477 U.S. at 322-23.

## B.   Counts I & II: Discrimination and Retaliation Pursuant to Chapter 151B

### 1.   Exhaustion

Defendant first argues that Gudava has failed to exhaust her Chapter 151B claims for discrimination and retaliation in so far as they are based on conduct that occurred after August 28, 2017.  Gudava contends that she has fully exhausted her claims by filing a complaint with MCAD.

MCAD is charged with addressing disability discrimination in the Commonwealth. _Everett_ v. _357 Corp._, 904 N.E.2d 733, 746 (Mass. 2009).  To that end, Chapter 151B requires a plaintiff to exhaust discrimination claims with MCAD before filing a civil action in Massachusetts Superior Court for discrimination or retaliation. M.G.L. c. 151B § 5.  A plaintiff need not await final determination by MCAD; she may remove her MCAD complaint

to Massachusetts Superior Court either 90 days after the filing of the complaint or sooner with MCAD's consent. Id. § 9.

A plaintiff generally may not assert claims in a civil action that are outside of the scope of the MCAD investigation. Everett, 904 N.E.2d at 748. The MCAD complaint is not, however, a "rigid blueprint" for the civil action. Id. The "scope of investigation" rule counsels that a claim not expressly stated in an MCAD complaint may nonetheless be asserted in a subsequent civil action if "it is based on acts of discrimination that the MCAD investigation could reasonably be expected to uncover." Windross v. Village Automotive Group, Inc., 887 N.E.2d 303, 307 (Mass. 2008). Claims of retaliation are typically covered by the scope of investigation rule. See, e.g., Clifton v. Massachusetts Bay Transp. Auth., 839 N.E.2d 314 (2005).

Gudava's MCAD complaint did not allege any discriminatory or retaliatory acts relating to her termination or any facts that would potentially cause MCAD to investigate the reasons for her termination. Indeed, her MCAD complaint could not have so alleged because she was not terminated until after MCAD granted her request to withdraw her complaint so she could pursue a civil action. Any claim based on Gudava's alleged wrongful termination pursuant to Chapter 151B is, therefore, unexhausted. See Everett, 453 Mass. at 603.

## 2.  Timeliness

Defendant next contends that Gudava's claims are untimely insofar as they rely on conduct that occurred before September 27, 2016.  Defendant concedes in its reply that

> Ms. Gudava has not identified any conduct that occurred before September 27, 2016, for which she seeks to recover.

As a result, there is no issue with respect to timeliness for the Court to resolve.

## 3.  Disability Discrimination

To make out a prima facie case of disability discrimination pursuant to Chapter 151B, a plaintiff must show that 1) she has a qualified disability; 2) she was able to perform the essential functions of her position with a proposed reasonable accommodation; 3) such an accommodation was requested; 4) her employer rejected that request; and 5) that rejection resulted in some harm. Alba v. Raytheon, Co., 809 N.E.2d 516, 533 n.9 (Mass. 2004).

Chapter 151B "tracks the [Americans with Disabilities Act ("ADA")] in virtually all respects." Gillen v. Fallon Ambulence Serv., Inc., 283 F.3d 11, 20 n.5 (1st Cir. 2002).  For that reason, federal law interpreting the ADA is instructive. See, e.g., Tate v. Dep't of Mental Health, 645 N.E.2d 1159, 1163 (Mass. 1995).

NHC apparently does not dispute that Gudava has a disability within the meaning of the law.  Instead, NHC disputes Gudava's ability to perform the essential functions of a Staff Pharmacist because her requested accommodation would require that she work only day shifts ending before 6-7 P.M.

An employer need not forgo an essential function of a position to accommodate and employee's disability.  See, e.g., Miller v. Illinois Dep't of Corrections, 107 F.3d 483, 484 (7th Cir. 1997).  Gudava bears the burden of establishing that she was able to perform "all essential, as opposed to marginal, functions" of a Staff Pharmacist position.  See Melo v. City of Somerville, No. 18-10786, 2019 WL 1230365, *3 (D. Mass. Mar. 15, 2019).  In evaluating the essential functions of a position, an employer's determination that a job requirement is essential, while not definitive, is afforded "substantial weight."  Ward v. Massachusetts Health Research Inst., Inc., 209 F. 3d 29, 34 (1st Cir. 2000).

Informative of the essential functions inquiry here is Laurin v. Providence Hospital, 150 F.3d 52 (1st Cir. 1998).  In Laurin, a registered nurse working in a 24-hour maternity unit of a hospital sued her employer for disability discrimination for failing to accommodate her request to work only day shifts due to a seizure disorder.  Id. at 54.  The hospital maintained,

and the First Circuit Court of Appeals agreed, that the ability to work a shift-rotation schedule was an essential function of the role of a nurse in 24-hour hospital. Id. at 55-63.

Gudava attempts to distinguish Laurin by emphasizing that, whereas the hospital in Laurin had never provided an exception for the shift-work requirement, NHC accommodated Gudava by not scheduling her to work the overnight shift for years and by employing Staff Pharmacists to work exclusively evening, swing and overnight shifts. NHC's decision to accommodate Gudava temporarily by allowing her to avoid working overnights does not undermine its contention that it was unreasonable for Gudava to be excused from working all evening and swing shifts indefinitely. Furthermore, the hospital in Laurin also employed individuals to work just evening and overnight shifts. Id. at 59. In short, Gudava's attempts to distinguish Laurin are unavailing and the Court agrees with NHC that the ability to work more than a single shift in rotation is an essential function of a Staff Pharmacist position at Beverly.

Even if shift work were not an essential function, Gudava's claim still fails because defendant met its burden of engaging in the interactive process with Gudava and offering a reasonable accommodation. An employer need not provide an employee with the precise accommodation requested; it need only fulfill its

"duty . . . to engage in an interactive process." Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008).  Likewise, if the employee fails to cooperate in the interactive process, the employer may not be held liable for failure to accommodate. E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 131-32 (1st Cir. 2014).

NHC offered Gudava the alternative accommodation of a per-diem position, which would have allowed her to avoid entirely working swing, evening and overnight shifts.  Several courts have held that offers of part-time employment may be a reasonable accommodation. See Magnussen v. Casey's Mktg. Co., 787 F. Supp. 2d 929, 958 (N.D. Iowa 2011); Pedroza v. Autozone, Inc., 536 F. Supp. 2d 679, 699 (W.D. Tex. 2008).  Gudava was not obligated to accept this proposal but she was obligated to engage in the interactive process with NHC.  The record shows that, to the contrary, Gudava rejected NHC's proposal outright and failed to respond to NHC's numerous follow-up invitations for reconsideration.

Accordingly, Gudava has failed to establish a prima facie case of disability discrimination and summary judgment will be entered for defendant.

### 4.   Retaliation

To establish a <u>prima facie</u> claim of retaliation in violation of Chapter 151B, plaintiff must demonstrate that 1) she engaged in protected conduct; 2) she suffered an adverse employment action; and 3) the two were causally related. <u>Noviello</u> v. <u>City of Boston</u>, 398 F.3d 76, 88 (1st Cir. 2003).

The parties do not dispute that Gudava engaged in protected conduct.  Defendant does, however, dispute whether Gudava suffered an adverse employment action as a result of engaging in that protected conduct.

As discussed above, Gudava cannot point to her termination as an adverse employment action because such a claim, pursuant to Chapter 151B, is unexhausted.  An adverse employment action may, however, be satisfied by demonstrating "sufficiently severe or pervasive" workplace harassment. <u>Noviello</u>, 398 F.3d at 91; <u>see</u> <u>also</u> <u>Clifton</u> v. <u>Mass. Bay Transp. Auth.</u>, 839 N.E.2d 314, 318 (Mass. 2005).

A plaintiff may recover for retaliatory workplace harassment if

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

_Noviello_, 389 F.3d at 84 (quoting _Harris_ v. _Forklift Sys., Inc._, 510 U.S. 17, 21 (1993)).

Gudava proffers a laundry list of conduct in which Cahill purportedly engaged to support her hostile work environment claim. For such conduct to be actionable, it must rise to "some level of substantiality," such that it materially altered the conditions of Gudava's employment. _Noviello_, 389 F.3d at 92. The alleged harassment must also be both "objectively and subjectively offensive," such that a reasonable person would perceive Cahill's conduct as hostile or abusive, and that Gudava in fact did perceive Cahill's conduct to be so. _See Faragher_ v. _City of Boca Raton_, 524 U.S. 775, 787 (1998). The subjective element is uncontroversial in this case.

With respect to the objective component, a court must "mull the totality of the circumstances," looking at factors such as frequency and severity, whether the conduct was physically threatening or humiliating and whether it unreasonably interfered with the performance of the employee. _Noviello_, 389 F.3d at 92.

This Court is skeptical that the conduct described by Gudava is sufficient to convince a reasonable jury that Cahill's conduct was so severe and pervasive that it amounts to creating an actionable hostile work environment. Even if it did,

however, Gudava fails to carry her burden of establishing a causal link between her engaging in a protected activity and the claimed harassment.  Indeed, Gudava offers nothing more than mere speculation to connect the alleged hostile work environment and her complaints about Cahill to her migraine headache condition, proffering no substantive basis for the Court to draw such a conclusion.

Accordingly, Gudava has failed to establish a _prima_ _facie_ case of retaliation and summary judgment will be entered for defendant.

### C.    Count III: Wrongful Termination

Gudava claims that NHC wrongfully terminated her in violation of Massachusetts public policy when she was fired for failing to implement an internal policy that she believed compromised patient safety.

As a general rule, "an at-will employee may be terminated at any time for any reason or for no reason at all." See Upton v. JWP Businessland, 682 N.E.2d 1357, 1358 (Mass. 1997).  An employer may nonetheless be held liable under Massachusetts law for terminating an employee for a reason that violates a clearly established public policy. Id.  This rule was intended to provide a course of redress for employees who are terminated for, among other things,

asserting a legal right (<u>e.g.</u>, filing a workers'
compensation claim), for doing what the law requires
(<u>e.g.</u>, serving on a jury), or for refusing to disobey
the law (<u>e.g.</u>, refusing to commit perjury)

<u>Id.</u>

The public policy exception does not, however, protect
employees from termination for reasons relating to internal
company politics, such as, failing to comply with internal
procedures, making internal reports of issues to high-
ranking officials, expressing disagreement with a
reorganization plan or complaining about trade practices.
<u>Upton</u>, 682 N.E.2d at 1359.

In <u>Smith-Pfeffer</u> v. <u>Superintended of the Walter E.
Fernald State School</u>, 533 N.E.2d 1368, 1369-70 (Mass.
1989), an employee of a facility for mentally handicapped
individuals was fired for opposing an internal policy as a
"threat to the well-being of the institution and its
residents."  The Supreme Judicial Court of Massachusetts
held that the employee's termination did not violate
Massachusetts public policy because an employee, "even one
in a socially important occupation", may not seek redress
in the courts for disagreeing with her employer's policies.
<u>Id.</u> at 1371-72.

The public policy interest proffered by Gudava
regarding patient safety reflects an internal policy

disagreement with her employer's policies.  Consequently,
her termination does not violate public policy.

### D.    Count IV: Interference in Violation of the FMLA

A <u>prima</u> <u>facie</u> case of interference in violation of the FMLA
requires a plaintiff to show that her employer denied her FMLA
benefits to which she was entitled. <u>Carrero-Ojeda</u> v. <u>Autoridad</u>
<u>de Energia Electrica</u>, 755 F.3d 711, 722 n.8 (1st Cir. 2014).
Gudava alleges that Cahill interfered with her FMLA leave by
assigning her shifts after her doctor recommended that she be
excused from work on intermittent FMLA leave in June, 2017.  As
defendant emphasizes, however, Gudava was scheduled to work the
shifts that allegedly interfered with her leave before she
requested FMLA leave in June, 2017.

In any event, the FMLA does not provide relief unless an
employee is prejudiced by any employer's interference. <u>Fraternal</u>
<u>Order of Police Lodge 1</u> v. <u>City of Camden</u>, 842 F.3d 231, 246 (3d
Cir. 2016) (internal quotations omitted).  Here, Gudava was not
deterred from taking the intermittent and continuous leave to
which she was entitled in June, 2017, or, on this record, at any
other point in time.  As a result, she cannot demonstrate
prejudice and is, therefore, not entitled to recovery under the
FMLA.

**E.    Count V: Retaliation in Violation of the FMLA**

Allegations supporting Gudava's FMLA retaliation claim similar to those supporting her Chapter 151B retaliation claim fall into two categories: 1) those relating to hostile work environment and 2) those relating to termination.  With respect to the former, Gudava's claim fails for the same reasons articulated as to her Chapter 151B claim.  Gudava's FMLA claim based on the latter category cannot, however, be disposed of in the same manner as its Chapter 151B counterpart because it is not subject to a corresponding procedural deficiency of failure of exhaust.

To establish a <u>prima facie</u> case of FMLA retaliation based on wrongful termination, Gudava must establish that 1) she availed herself of a protected right under the FMLA; 2) she was adversely affected by a decision of her employer; and 3) there is a causal connection between her protected activity and the adverse employment action. <u>See</u> <u>Hodges</u> v. <u>Gen. Dynamics Corp.</u>, 144 F.3d 151, 161 (1st Cir. 1998).

The first element is uncontested.  The second element is also satisfied because Gudava alleges that she was terminated by her employer, a quintessential adverse employment action. <u>See</u> <u>id.</u> at 160.  The third element depends upon whether there is a causal connection between the termination and the exercise of an

FMLA right.  Gudava's termination followed a period of
intermittent and continuous FMLA leave.  Her claim is sufficient
to meet the prima facie burden.  Hodges, 144 F.3d at 161
(explaining that the prima facie burden is "quite easy to meet"
and finding the causation factor met where the protected conduct
was followed close in time by the adverse action).

    After a plaintiff has met her burden of establishing a
prima facie case, as Gudava has done here, the McDonnell Douglas
test allocates the burdens of production and persuasion in
determining whether NHC terminated Gudava's employment because
of FMLA activity or for a legitimate, nondiscriminatory reason.
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973).

    McDonnell Douglas counsels that the burden shifts initially
to the defendant to articulate a legitimate, nondiscriminatory
reason for the employee's termination.  Id.  If the employer
meets its burden, any presumption of discrimination dissipates,
and the plaintiff retains the ultimate burden of demonstrating
that the employer's stated reason for termination was
pretextual.  Id. at 804.

    Here, NHC has met its burden of proffering a legitimate,
nondiscriminatory reason for Gudava's termination: her repeated
noncompliance with NHC policies.  In support, defendant proffers
documented evidence of Gudava's noncompliance with the TI

Program, the Patient Counseling Program and NHC's Work Rules Policy.

Attempting to carry her ultimate burden of demonstrating that NHC's proffered reason is mere pretext for discrimination, Gudava retorts that although other Staff Pharmacists similarly failed to comply with NHC policies, only she was terminated for noncompliance. Although persuasive, Gudava's response does not support an entry of summary judgment in her favor. It does, however, create a genuine issue of material fact as to the true impetus for Gudava's termination.

Accordingly, defendant's motion for summary judgment on Gudava's claim of retaliatory termination in violation of the FMLA will be denied.

## III. Defendant's Motion to Strike

Defendant moves to strike three categories of materials from plaintiff's opposition to summary judgment: 1) statements from certain NHC employees; 2) statements in plaintiff's affidavit; and 3) several responses to defendant's Statement of Undisputed Material Facts ("SOF").

### A. Statements of Rita Matlis and Lillian Lammy

Defendant complains that the Court should strike from the record plaintiff's "Declaration of Rita Matlis", attached as Exhibit 5 to plaintiff's opposition to defendant's SOF ("the

Matlis Statement") and an email Lillian Lammy sent to plaintiff's counsel, attached as Exhibit 6 to plaintiff's opposition to defendant's SOF ("the Lammy Email") for noncompliance with Fed. R. Civ. P. 56.

A party claiming that a fact is or is not genuinely disputed on summary judgment must provide support by citing to materials in the record, including affidavits or declarations. Fed. R. Civ. P. 56(c). Such an affidavit or declaration need not be signed in the presence of a witness or notarized but it must bear a signature, electronic or otherwise, that substantially comports with the following form:

> I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature).

28 U.S.C. § 1745(1).

Neither the Matlis Statement nor the Lammy Email bear a signature that remotely comports with § 1745(1) and, for that reason, cannot be relied upon in opposition to defendant's motion for summary judgment. See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hartell v. Medfit Intern., Inc., 982 F.2d 686, 689-90 (1st Cir. 1993). Accordingly, the motion of defendant to strike the Matlis Statement and the Lammy Email will be allowed.

## B.  Plaintiff's Affidavit

Defendant moves to strike numerous statements in Gudava's affidavit submitted in support of her opposition to summary judgment, on grounds that they 1) are inconsistent with prior testimony, 2) reflect subjective beliefs; and 3) lack specificity and support.

In deciding defendant's motion for summary judgment, the Court has given Gudava's affidavit the credence it is due considering the rules and law applicable to the content of affidavits forming the record on summary judgment.  On that basis, defendant's motion to strike plaintiff's affidavit will be denied.

## C.  Plaintiff's SOF Responses

Defendant moves to strike several of Gudava's responses to NHC's SOF because they are 1) "denials" that do not actually deny the substance of the paragraph; 2) inadmissible hearsay; 3) unsupported by evidence; and 4) impermissible legal arguments.

### 1.  "Denials"

Responses to Paragraphs 11, 12 and 14:  Gudava's denials do not affect the veracity of the substance of the respective paragraphs and will, therefore, be treated as admissions.

Responses to Paragraphs 5, 25, 129 and 130:  Gudava's
denials are irrelevant to the substance of the respective
paragraphs and are limited to emphasizing that Cahill supervised
schedule preparation.  Consequently, they will be treated as
admissions.

Responses to Paragraphs 66, 68, 90, 105, 106, 111, 113,
137, 139, 146 and 159:  Gudava's denials either do not address
the substance of the respective paragraphs or purport to add
additional, noncontradictory facts.  Consequently, they too will
be treated as admissions.

Paragraphs 120, 122 and 158:  Gudava's denials address the
substance of the respective paragraphs and, accordingly, will be
treated as denials.

### 2.   Hearsay

Defendant moves to strike Gudava's responses to Paragraphs
118, 120, 121, 122, 123, 133 and 134 to the extent they rely on
the contents of Gudava's written appeal of the First Warning she
received from NHC, which NHC contends is hearsay.  Plainly, the
content of Gudava's written appeal is hearsay: it is an out of
court statement, offered in evidence to prove the truth of the
matter asserted. Fed. R. Evid. 801(c).  Regardless of whether it
satisfies an exception to the hearsay rule, defendant cannot
simultaneously rely on evidence of the First Warning it issued

to Gudava and bar Gudava from introducing evidence of her written appeal of that warning.  Fairness dictates that either all or none of the entire record of Gudava's First Warning, including her appeal, will be admitted. See Fed. R. Evid. 106. Accordingly, defendant's motion to strike Gudava's responses relying on her appeal will be denied.

### 3.    Noncompliance with Local Rule 56.1

Defendant next submits that several of Gudava's responses do not comply with Local Rule 56.1 because they do not cite to evidence and instead deny the paragraph on the sole basis that defendant's only support is a "self-serving affidavit". Plaintiff is entitled to challenge the sufficiency of defendant's proffered evidence and such challenges will not be deemed admissions.

Defendant also requests that the Court deem admitted Paragraphs 182 and 183 because plaintiff failed explicitly to deny or admit.  Plaintiff claims she inadvertently omitted the word "denied" but that her response supports a denial.  The Court agrees and will deem Paragraphs 182 and 183 denied.

### 4.    Interposing Legal Argument

Finally, defendant claims that several of plaintiff's responses impermissibly include legal argument.  The Court agrees and, in its analysis of the sufficiency of the proffered

evidence, declines to accord any weight to legal arguments contained in plaintiff's responses.

**ORDER**

For the foregoing reasons, the motion of defendant for summary judgment (Docket No. 40) is, with respect to plaintiff's claim of retaliatory termination in violation of the Family and Medical Leave Act, **DENIED,** but is otherwise **ALLOWED.**

Furthermore, the motion of defendant to strike (Docket No. 58) is,

a. with respect to the written statements of Rita Matlis and Lillian Lammy, submitted as Exhibits 5 and 6 to Docket No. 55, **ALLOWED;**

b. with respect to the affidavit of Marina Gudava submitted as Exhibit 1 to Docket No. 55, **DENIED;** and

c. with respect to plaintiff's responses to defendant's Statement of Undisputed Material Facts, Paragraphs 5, 11, 12, 14, 25, 66, 68, 90, 105, 106, 111, 113, 129, 130, 137, 139, 146 and 159, **ALLOWED** but otherwise **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated February 13, 2020